NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1906-11T2
             A-2774-11T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

  v.

MARTELL J. LAND, a/k/a MARTELL
JIHAD LAND,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

  v.

SAMAD A. LAND,

      Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **March 18, 2014** |
| **APPELLATE DIVISION** |

Argued (A-1906-11T2) and Submitted (A-2774-11T2) November 6, 2013 — Decided March 18, 2014

Before Judges Fisher, Espinosa and O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 11-08-1848.

Michael Confusione argued the cause for appellant Martell Land (Hegge & Confusione, LLC, attorneys; Mr. Confusione, of counsel and on the brief).

The Law Offices of Jaime Kaigh, P.C., attorneys for appellant Samad Land (Jaime Kaigh, of counsel and on the brief).

Nancy P. Scharff, Assistant Prosecutor, argued the cause for respondent (Warren W. Faulk, Camden County Prosecutor, attorney; Ms. Scharff, of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In these appeals, we consider whether defendants received a fair trial in light of the prosecutor's opening statement, which informed the jurors they would receive evidence from an individual who never testified. We cannot say — in light of the less than overwhelming evidence of guilt — that the prosecutor's imprudent comments, even if made in good faith, failed to prejudice defendants. We, thus, reverse and remand for a new trial.

I

Defendants Martell Land and Samad Land were indicted and charged with the murder of Jamal Burgess, the attempted murder of Kareem Watkins, and other related offenses. They were jointly tried over the course of thirteen days in September and October 2011, and were acquitted of murder, attempted murder and conspiracy, but convicted of the lesser-included offense of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a), as

A-1906-11T2

well as second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). With the merger of defendants' convictions for possession of a weapon for an unlawful purpose into the aggravated manslaughter convictions, the judge sentenced defendant Samad Land to a twenty-seven-year prison term and defendant Martell Land to a twenty-five-year prison term, both subject to an eighty-five percent period of parole ineligibility. In addition, the judge sentenced both defendants to consecutive seven-year prison terms, subject to three-year periods of parole ineligibility, on their convictions for unlawful possession of a weapon.

Defendants separately appeal,[1] and both argue: (1) the prosecutor's opening statement exceeded the bounds of proper advocacy and prejudiced their right to a fair trial; (2) the judge erred in denying their motions for a new trial based on their claim that the verdict was against the weight of the evidence; and (3) the judge erred in denying an application to adjourn sentencing and in imposing sentences that were excessive. Defendant Samad Land also argues: (4) the judge failed to adequately instruct the jury.

---

[1]We now consolidate these appeals and decide them by way of this single opinion.

We agree with defendants' first argument that the prosecutor's opening statement unfairly prejudiced defendants and, therefore, we do not reach their other arguments.[2]

## II

The thrust of defendants' appeal is their argument that the prosecutor, in her opening statement, extensively incorporated numerous factual statements that were never proven. This was largely precipitated by the fact that a witness the State anticipated would testify — Kareem Watkins — later refused to testify despite a grant of immunity.

The relevance of this event is best understood in light of the competing theories as to what occurred on South Eighth

---

[2] As a result of our disposition of this first argument, we need not consider the arguments about the sentencing proceedings as well as the sentences imposed or the argument only Samad has made regarding the judge's denial of his request for a "false-in-one-false-in-all" charge. And, although a successful argument that a verdict was against the weight of the evidence might, in some instances, preclude a defendant's retrial, see Tibbs v. Florida, 457 U.S. 31, 42-43, 102 S. Ct. 2211, 2218-19, 72 L. Ed. 2d 652, 661-62 (1982), defendants do not appear to make that argument here.  That is, their weight-of-the-evidence arguments are based on the prosecutor's opening and not on a claim that the evidence was so wanting as to preclude a finding of guilt. For instance, defendant Martell Land argues, in contending the verdict was against the weight of the evidence, that the prosecutor's opening resulted in a "manifest denial of justice under the law. . . . warrant[ing] . . . a new trial."  So viewed, we need not reach defendants' weight-of-the-evidence arguments because we agree with their contention that the prosecutor's opening prejudiced their right to a fair trial and necessitates a new trial.

Street in Camden at approximately 7:40 p.m., the evening of January 20, 2010.

A

The prosecutor's opening statement adopted Kareem Watkins's version: that defendants Martell Land and Samad Land — who are cousins and, for clarity purposes, we will sometimes refer to them by their first names — had a "grudge" against Watkins, knew Watkins frequented an area of South Eighth Street in Camden, and, that night, sat and waited for Watkins to arrive. According to this version, Watkins arrived at South Eighth Street and, unexpectedly, ran into a lifelong friend, Jamal Burgess; Watkins and Burgess sat in the former's vehicle and spoke when defendants, who had observed Watkins was "a sitting duck," came out of their hiding place "with guns blazing." The prosecutor further asserted that after defendants opened fire, Burgess told Watkins he had been shot. Watkins, who had coincidentally been looking at a handgun Burgess showed him immediately before the shooting began, decided the best way to help his friend was to get to the hospital and to accomplish that by returning fire. During the gun battle that followed — again, according to the prosecutor — Watkins observed he had shot one of his assailants; he was eventually able to drive to Cooper Hospital in Camden, where Burgess died.

In advocating Watkins's version about the shooting, the prosecutor recognized that during the police investigation that immediately followed, Martell Land provided a different version than that which the State was expected to prove through the testimony of Watkins. That is, in her opening statement, the prosecutor told the jury that Martell told the police he and Samad "were walking down the street going to a relative's house or a friend's house in the area and a van, all of a sudden, out of the blue, for no reason, shot at them and left the area." According to the prosecutor's opening, the investigation that followed was intended to determine what occurred — in light of these conflicting versions — from the location of shell casings, the clothing of those who were shot, and other physical evidence. The prosecutor argued to the jury that the police "were able to corroborate that Kareem Watkins'[s] version of events was true and that the version of events that Martell Land gave did not match up with the physical evidence." This assertion, by its very terms, necessarily depended upon Watkins's testimony.

When the prosecutor finished her opening statement, both defense attorneys objected to her statement that defendants had "a grudge against Watkins and sought to kill him." Perhaps prescient or perhaps simply dubious about whether Watkins would

A-1906-11T2

testify, counsel claimed there would be no evidence to support the claim of a grudge and sought to have the judge require that the prosecution explain "how she's going to prove it." The judge declined to require a proffer, but he did instruct the jury that what attorneys say in openings and summations is not evidence.

Defense counsel then responded to the prosecution's opening. In his argument, Martell's counsel asked the jury to be cautious about the State's theory:

> The way you do this is you not only listen to what [the witnesses] have to say but you listen to how they say it because as the prosecutor told you, Kareem Watkins is a convicted felon. He's a convicted drug dealer. He's been to state prison. He's a felon who had a weapon with him.
>
> . . . .
>
> Kareem Watkins is a twice-convicted drug dealer.
>
> . . . .
>
> [T]he State also has decided in its infinite wisdom that they're going to give him immunity from prosecution. They're never going to charge him with the fact that he was sitting in a car with a gun and that he shot two individuals. He's never going to be charged with that crime as long as he testifies here.
>
> This is not something that you should take as gospel from me. Listen to what happens and listen to the evidence as it comes out. He's got immunity from prosecution.

7

With that characterization of Watkins, defense counsel suggested a different theory, supported by statements Martell gave to police, that defendants: had visited two girls in a nearby neighborhood; were walking down South Eighth Street toward Martell's sister's house on Ferry Avenue when caught in a crossfire; and, in the midst of this gunfire, Martell was shot in the upper right leg, and Samad was shot in the abdomen. Defense counsel further argued that, after the shooting ended, Watkins drove to the hospital and, on the way, "threw the gun out the window that he had shot [defendants] with, . . . dropped his friend off at the hospital, drove the car to some area in Camden and covered it with a tarp."

Martell's attorney further argued to the jury that Watkins gave police a statement, which contained "a couple of real interesting facts that the prosecutor never told you in her opening statement," including that Watkins could not identify the shooters, because "they had masks on, they were all dressed in black, and, lo and behold, he wasn't even shooting back at them." In fact, as argued by Martell's attorney, Watkins told police that it "was Burgess who did it."

Martell's attorney also referred to a prosecution witness not mentioned in the prosecutor's opening — Diana Stratton Green — who later identified defendants as having shot at Watkins and

Burgess and who also gave other information helpful to the State. As then argued by Martell's attorney, Green had

> recently been indicted by the Camden County Grand Jury and is being prosecuted by this Prosecutor's Office — this Prosecutor's Office — . . . [for] three counts of falsely incriminating other people. This is an eyewitness that the prosecutor's going to ask you to rely on to present credible testimony that the Lands were involved.
>
> . . . .
>
> When you hear her testimony, I suggest it's going to make very little sense. Ask yourselves as she testifies how she was able to observe what she says she was able to observe. I suggest it will make no sense at all.

In his opening statement, Samad's attorney questioned the credibility of Watkins and the framework on which the State's theory of what occurred that night was based.

B

The same day counsel made their opening statements — during a break in the testimony of the State's second witness — the trial judge revisited the objection lodged by defense counsel immediately after the prosecutor's opening statement. Defense counsel again urged that the prosecutor had told the jury that defendants had a motive to try to kill Watkins — that they had a "grudge" against him. And defense counsel reminded the court that the prosecutor

told the jury in the opening statement that the defendants sat and waited for the victims. That's what she said. There's not a scintilla of evidence, unless I missed it in the discovery, that would support that. You can't make stuff up, Judge.

After some discussion, the judge held that a mistrial was not required and that he did not believe, if this motive could not be proved, that it would require reversal of any conviction that might follow.

At the end of the next trial day, defense counsel inquired of Watkins's whereabouts and asked for a representation from the State as to his location, advising the judge that they had:

endeavored . . . to locate Kareem Watkins in an effort to take a statement from him. We have been unable to locate him. I have asked the prosecutor for his location and been advised that she has given us his last known address.

The judge ordered the prosecutor to provide the defense information as to where Watkins could be found, to which the prosecutor responded, "[defense counsel] wants me to represent that I don't have a witness," but upon further discussion, the prosecutor said:

I have no additional information other than what I have. I do not have him in a hotel. I do not have him in a safe house. I indicate that this is what is being requested, that they want —

THE COURT: You have no custody of him.

[THE PROSECUTOR]: I don't have custody of him.

THE COURT: You don't have him stashed anywhere.

[THE PROSECUTOR]: No.

. . . .

[MARTELL'S COUNSEL]: The representation to me was you have his last known address, that's all we have. If that's the case I can't ask for any more.

[THE PROSECUTOR]: That is the case.

At the end of the next trial day, the prosecutor advised the judge that she would prefer to refrain from calling any remaining witnesses until Watkins testified. During this colloquy, the judge and counsel discussed the fact that the State had applied ex parte a few days earlier for a material witness warrant for Watkins' arrest, and Watkins had turned himself into police that day. Because Watkins's attorney was unavailable at that time, however, a hearing was conducted the following day before a different judge (the motion judge),[3] who, after hearing the testimony of three law enforcement officers and Watkins, found that: Watkins had previously been served with a subpoena to appear for trial; he was a material witness; he knew he was required to appear to testify; he failed to

---

[3]The trial judge was not available at that time.

appear; and he should, therefore, remain in custody. The motion judge further directed that although Watkins was entitled to confer privately with his own attorney, "there shall be no discussions regarding any substantive matters relating to this case with any members of the Camden County Prosecutor's Office or law enforcement during his confinement."

The morning of the next trial day, the trial judge was presented with additional difficulties. With the motion judge having determined that Watkins was a material witness, the trial judge was advised that another member of the firm that represented Martell had represented Watkins in the past, raising the potential for a conflict of interest. And, to compound these troubles, the State that morning also presented a motion to restrict courtroom access during Watkins's testimony. In expressing understandable displeasure with Martell's attorney for not having previously determined the existence of the potential conflict — a circumstance no longer relevant — the judge described Watkins's importance to the State's case in the following way:

> He's the main witness, the key witness.
> He's the guy that was, quote, unquote, the
> intended victim, according to the State, of
> the shooting. He's the guy that was sitting
> next to Burgess when Burgess was shot.

12

The conflict-of-interest issue became moot when Watkins took the witness stand outside the presence of the jury and refused to answer any questions in light of his "constitutional rights," which his attorney described as "his right to counsel, his right to the Fifth Amendment and his right to due process." The State then advised the trial judge that Watkins had been granted immunity by the Attorney General and the Camden County Prosecutor. Although Watkins's attorney argued that the grant of immunity was unenforceable — because, counsel argued, it was coerced — he also argued the grant of immunity would "not remove his right to due process, it does not remove his right to counsel, both of which were violated in the obtaining of [an earlier] statement [from Watkins] and neither of which were made clear or at least even suggested to the [A]ttorney [G]eneral or to Your Honor." For reasons thoroughly outlined during this lengthy colloquy, the trial judge determined that "the use immunity and its derivative use immunity and limited use immunity" to Watkins were enforceable, and he ordered Watkins to testify or else be held in contempt. Watkins continued to refuse to testify.

The next day Watkins resumed the stand — again, outside the presence of the jury — and, in light of the grant of immunity, the trial judge ordered Watkins to answer questions about the

13

case.   In response to each of the prosecutor's questions, Watkins responded he was relying on his constitutional rights. After a while, the judge determined that it was fruitless to continue and held Watkins in contempt; he also instructed Watkins that he could purge the contempt by advising of his desire to testify.   Watkins never made any attempt to purge the contempt and never testified in this case.[4]

C

Without Watkins's testimony, the State attempted to prove its case through: the testimony of law enforcement officers regarding the tangible evidence gathered during their investigation; Martell's statements, which the police secretly recorded; video gathered from two locations near the shooting; and the testimony of Melissa Gonzalez and Diana Stratton Green.

1. <u>Forensic Evidence</u>

Senior Investigator Steven T. Settles, who has since retired, testified about the evidence collected at the scene of the gunfire.   In advance of trial, he prepared a sketch of the area, including the location of various pieces of evidence found

---

[4]Watkins's refusal to testify occurred outside the jury's presence and, so, the jury never saw Watkins.   No one argued then, and no one argues now, that Watkins's refusal to testify should have been played out in front of the jury.

A-1906-11T2

at the scene. The sketch suggested that twenty-five shell casings and five spent bullets were found at the scene. He also identified, among other things, a piece of the vehicle that departed the scene, window glass from a vehicle, a piece of black thermal clothing, and blood. No weapons were recovered.

Investigator Settles also testified about his inspection of a vehicle (hereafter "the Uplander") that was apparently used by Watkins to depart the area and later found elsewhere, covered by a tarp. He testified that the Uplander's windows were "broken out on both sides of the vehicle" and there appeared to be blood inside the vehicle.

Another officer inspected an area near the intersection of Ferry and Kossuth Avenues — approximately three blocks from the shooting — where an ambulance had been summoned by 9-1-1 calls made by both Green and defendant Martell Land.[5] Both defendants were treated at that location by ambulance workers for gunshot wounds and then transported to a nearby hospital. Clothing was obtained and bagged there as well as at the hospital. Blood samples at this location were also gathered.

Later, while Investigator Settles was removing Samad's clothing from an evidence bag, a bullet fell out. This

_____

[5]Melissa Gonzalez, who witnessed some part of the shooting, also called 9-1-1.

A-1906-11T2

projectile as well as other ballistics evidence — including two shell casings that were recovered from grooves in the roof of the Uplander — were forwarded to the State Police Lab. No fingerprints were obtained from this evidence. The ballistics expert concluded that four weapons were involved in the shooting.

None of the ballistic evidence directly demonstrated that defendants had fired any shots at either Watkins or Burgess. In short, none of this evidence called into question defendants' theory that they were merely walking by when caught in the middle of a gun battle between others. Indeed, some of this evidence raised additional questions. Accepting the State's ballistic evidence as accurate, the jury would have had to conclude that a projectile found in the Uplander, in which Burgess was killed, came from the same gun as the spent bullet found among Samad's clothing. Based on this evidence, Martell's attorney argued in his summation that the jury would have to conclude that whoever shot at Burgess also shot at Martell — a fact entirely inconsistent with the State's version of the facts — unless the jury were to believe that one of the defendants not only shot Burgess but also shot himself or his cousin.

A-1906-11T2

## 2. Martell's Statements

The State also relied on statements given by Martell that night when Sergeant Patricia Taulane, the lead investigator, secretly recorded their conversations. When they first spoke, Martell was still in a hospital bed in the trauma area.[6]

Martell said he and Samad were walking on South Eighth Street toward his sister's home on Ferry Avenue when he heard gunshots and "a car whipped up" with lights that were "kinda high, like a truck or a van." With the sound of the first gunshot, defendants "just took off." Martell denied that either he or Samad was in possession of a gun, and he asserted that he and Samad ran to the corner, made a left on the next intersecting street — Jefferson Street — and then to Kossuth Avenue. They stopped across from a grocery store, and Martell called 9-1-1. When Sergeant Taulane told defendant that night that witnesses said he and Samad were "shooting back" at the van, he denied it.

Later that night, after Martell was medically cleared, Sergeant Taulane drove Martell back to the scene and asked him about the route he and Samad took once the shooting started. This conversation was also secretly recorded. His statement at

---

[6] Samad was in surgery and unavailable to give a statement.

A-1906-11T2

this time about the route he and Samad had taken was consistent with what he told Sergeant Taulane at the hospital.

### 3. Videotape Evidence

Police also obtained videotape from a camera at a nearby apartment complex that was pointed toward the intersection of South Eighth Street and Jefferson Avenue, as well as from cameras located inside and outside a grocery store on the corner of Kossuth and Ferry Avenues, near where defendants were treated by paramedics before being transported to the hospital.

The images captured from the apartment complex's video camera — recorded between 7:35 p.m. and 7:55 p.m. that night — are not self-evident. According to Officer John Denmark, who gathered the footage, the camera "is actually looking across . . . Eighth Street towards Jefferson." Our examination of the video reveals that one individual entered the frame from the left side and moved only a few feet toward the right of the frame. That individual then walked back to the left of the frame and appears to fire a single shot — perhaps two — while still in the frame; the images do not reveal what it was that this individual may have been shooting at. Then, two individuals — perhaps the individual who appeared to fire one or two shots a few moments earlier and another not previously

18

depicted in this footage[7] — enter the frame from the left; these two individuals are depicted running up what we assume is Jefferson Avenue and out of the frame.[8]

Officer Denmark also obtained footage from video cameras mounted inside and outside the grocery store at the corner of Ferry and Kossuth Avenues. The prosecution's claim in summation that the images depicted in this video support the State's theory arises from the alleged similarity in clothing worn by Martell while in the grocery store and the clothing of the gunmen described by eyewitnesses, i.e., dark hooded sweatshirts and blue jeans.[9]

---

[7]It is not evident that the two individuals who enter the frame at this point are armed. We emphasize that this is our interpretation of this videotape, and the influence of our interpretation on the disposition of this appeal may be limited, cf., State v. Diaz-Bridges, 208 N.J. 544, 565-66 (2011), but we also note that no witness ever identified the individuals depicted in the apartment complex videotape.

[8]Sergeant Taulane testified that Martell's recorded description of the route he and Samad took when the shooting started is the same route taken by the individuals in the videotape. Sergeant Taulane also reported that Martell said he and Samad were not armed, which conflicted with her own interpretation of the video.

[9]The prosecutor argued in summation that Martell was wearing a jacket with the number 96 on it while in the grocery store and that matched the jacket gathered by the investigators outside the grocery store. Since defendants' view of the evidence does not dispute that they were outside the grocery store after the shooting, the grocery store video is barely probative of the facts in dispute.

### 4. Gonzalez's Testimony

Melissa Gonzalez testified that, on the night in question, she had just arrived at her residence, "seven apartments down" from the intersection of Eighth and Jefferson Streets. Gonzalez was in the process of bringing her small child into her apartment and laying him down on a couch when she heard what she thought was a firecracker. When she looked up, she observed individuals shooting handguns.

Gonzalez testified that she did not "know where the first shots were fired from." She was shown the video taken from the camera mounted near her location at the time, but she recognized it provided a view from a different vantage point. In addition, Gonzalez testified that she could not see the faces of the gunmen and could only say in that regard that "it was dark" and they were wearing "hoodies" with the strings "pulled down so you couldn't see" their faces. She also observed a vehicle pull up on a curb and drive off; she identified the vehicle as an Uplander that she had seen in the neighborhood previously.

### 5. Green's Testimony

As a result of the inconclusive nature of the forensic evidence, the absence of Watkins's testimony, and Gonzalez's inability to see the faces of the gunmen, the State's theory

that defendants shot at Watkins and Burgess largely rested on the testimony of Diana Stratton Green.  She testified that she knew defendants, and that she also knew Burgess "basically all [her] life."  Green testified that, at approximately 6:30 p.m. on the night in question, she was on the porch of her home on South Eighth Street with her husband, who was conversing with Watkins.  She recounted that, approximately fifteen minutes after Watkins returned to his vehicle, the two defendants "[came] down shooting . . . at [Watkins's] van."[10]  She said Burgess was outside Watkins's vehicle, "lean[ing] over just talking to him."

Green testified both defendants were in possession of guns and were shooting as they walked toward Watkins's van.  She then testified:

> I just seen them firing and then right after they started firing I seen [Burgess] had got shot, [Watkins] grabbed him in.  And then he was backing up and he started shooting and I just ran out my back door and ran to the store as fast as I can, because I didn't want to be a witness to anything.

She also testified that Watkins returned fire because she "[saw] fire coming from" the Uplander as Watkins put it in reverse and drove into the parking lot across the street.  Following those

_____

[10]Green was shown a photograph of the Uplander, which she identified as the van Watkins was then occupying.

observations, Green asserted that she left her house and went to a grocery store at Kossuth and Ferry Avenues "because I just wanted it to be known that I was in that store and I wasn't a witness[.]"

After making a small purchase at the grocery store, Green walked outside and saw both defendants walking toward her. As they neared, Samad fell into her arms. Green, a certified nursing assistant, helped him to the ground and called 9-1-1; she told the operator to hurry because Samad's complexion was gray and his pulse was "very slim." She remained with Samad until the ambulance arrived.

Green testified that Martell did not appear to be injured and, while she was assisting Samad, Martell walked across the street for a few minutes. She also testified that Martell walked back once the paramedics arrived and said that "he shot his self."

Green, however, did not report any of this to the police. And when an officer knocked on her door either that night or the next day, she did not answer. Three days later, police officers again sought to speak to her, and she provided a statement. Green did not tell police she had witnessed the shooting from her front porch; instead, she reported that she was walking on the street with her daughter and saw the gunmen, who were

wearing masks.  Green also gave police her maiden name instead of her married name.  She later gave a statement that she was on her porch instead of walking on the street, that her husband was also on the porch,[11] and that the gunmen were not wearing masks. In a statement given to police approximately nine months later, Green provided additional detail, including, for the first time, her claim that Martell told her he had shot himself.  She claimed fear of becoming a witness had caused her to give police her earlier false statements.[12]

Green also acknowledged she had a prior criminal record, which included a 2008 theft conviction for which she received and had successfully completed a probationary term.  In addition, Green conceded she had been charged in a Camden County indictment of giving a false police report, a matter still

---

[11]When cross-examined about her husband's presence on the porch during the shooting, Green was asked for her husband's whereabouts.  She said she did not know.  She also testified that she told the investigators that her husband is "a fugitive."

[12]The story she told as a substitute for the version she told at trial was that she was walking down the street with her daughter.  In asserting that she was in fear of telling the truth, Green cited the fact that she had children and was concerned for their safety; defense counsel effectively cast that in doubt, asking Green:  "You were so afraid that you told the police the very first time you spoke with them that your daughter was a witness to this, you were walking her down the street.  If you were so afraid to get your family involved, why would you have told the police your daughter was with you?"

pending at the time of the trial in this matter. The judge correctly instructed the jury that the pending indictment could be considered as "evidence of any bias or any potential motive or reason for [Green] to testify in a certain manner and . . . whether she may expect or seek favorable treatment from the State on pending charges in evaluating the credibility of her testimony."

Green was vigorously cross-examined not only with regard to her alleged fear of being a witness and the many inconsistent statements she had given police, but also with the fact that she was under indictment for, among other things, making a false police report. In addition to expressing a generalized fear of being a witness, Green testified her house "ha[d] been shot up" and "somebody . . . chas[ed] [her] on December the 18th in a car and pulled a gun out on me." Defense counsel asked whether she believed either defendant was responsible for these alleged occurrences. Her unresponsive answer was that, when arrested, Martell was in the company of Mitchell Brown, the person she had accused of these intimidating acts.[13] Later, she acknowledged the false charge for which she was indicted was made with regard

_____

[13]Later during cross-examination, Green denied she had testified that Martell and Brown were arrested at the same time. She said that she had earlier testified that Martell was arrested in the same vehicle that had chased her vehicle through Camden a few days earlier.

to Brown and her alleged false report included no mention of Martell's involvement.  She also admitted the indictment charged her with making terroristic threats to her daughter, and with attempting to wrongly incriminate her daughter by giving false information to the Camden County Prosecutor's Office, but denied she hoped the prosecutor's office was "going to work a deal" for her in exchange for her testimony in this case.

### III

Toward trial's end, the parties argued the impact of the significant variance between the State's original theory and the evidence the jury actually heard.  Proceeding line by line through a transcript of the prosecutor's opening statement, Samad's counsel pointed out that the prosecutor had asserted, among other things:  that defendants "had a grudge against Kareem Watkins and sought to kill him in any way they could"; that Watkins was "a creature of habit" and had a friend in the neighborhood that he regularly visited, and defendants knew this; that defendants "sat and waited" for Watkins to arrive; that, after the shooting began and Burgess was hit, Burgess "had the forethought to tell . . . Watkins, [']I'm shot, I'm shot[']"; that Burgess had brought a gun into Watkins's car; that Watkins saw defendants approach his vehicle firing their weapons; that Watkins made the decision to reach for the gun and

fire at defendants to gain an opportunity to take Burgess to a hospital; and that defendants shot at Watkins's vehicle as it sped away. Based on these statements, Samad's counsel requested a strong instruction from the judge to the jury — not, he said, "a milquetoast [instruction] [that] the things attorneys say in their openings are not evidence" — but a "point-by-point charge" as to what it was that the prosecutor said coupled with the judge's pronouncement that those things had not been proven:

> I'm asking for a strong and powerful curative . . . . And if you're going to give a charge that says what counsel said in their openings isn't evidence, I don't think you begin to answer the bell that's rung. You made a point to give a charge after my opening that I objected to and thought was inappropriate. I can't imagine that you wouldn't give a charge that protects this record from all the things the prosecutor has injected in her opening that did not come to pass.

Before ruling, the judge asked Martell's attorney whether he "want[ed] to espouse that position" as well. Martell's attorney responded, "[q]uite to the contrary, Judge." He stated that he had "just had the opportunity to read the transcript and what the prosecutor said in her opening [is] a bell . . . that can't be unrung." When the judge then asked whether he sought a mistrial, Martell's attorney said:

> No, I don't want a mistrial. . . . I don't want the [c]ourt at all to give curative instructions specifically telling the jury

26

to disregard those comments. The only charge the [c]ourt can give is what counsel says in their opening and their closing is not evidence. By giving a curative instruction you're simply highlighting what [the prosecutor] said in her opening. I don't know how I'm going to handle this yet in my closing. I've just had an opportunity to get [the transcript], and that's the reason we asked for it, but the opening is replete with problems here. And I certainly do not want the charge that [Samad's attorney] asked [for].

In response, and in reliance on State v. Carter, 54 N.J. 436, 450 (1969), the prosecutor argued that the State had acted in good faith:

> [THE PROSECUTOR]: The State went out of its way to ensure that Kareem Watkins was going to testify by getting him immunity. The State went out of its way to secure his appearance. The State went out of its way to assure that he could not assert his Fifth Amendment right. Everything we did we did in good faith. There no way to tell in our estimation that it was going to turn out this way.
>
> THE COURT: Stop, stop. You had some idea. In July[14] you made an application before me providing a petition for immunity. You must have had some idea you were going to have some difficulty.
>
> [THE PROSECUTOR]: Yeah. But, Judge, we did that prophylactically because [Watkins] admitted to the commission of a crime. It doesn't mean that we thought he would necessarily assert his Fifth. We said he may assert his Fifth and that's why we got

---

[14]Jury selection started in early September 2011.

27

the immunity.  It's one thing if we thought
he was going to assert his Fifth and we
didn't get him immunity.  But we, in fact,
got him immunity.  So I think the [c]ourt
would be hard pressed to say that we did not
make those representations in good faith.

In reliance on this claim of good faith, the prosecutor argued against an instruction along the lines described by Samad's attorney.

The judge, in further exploring the issue with counsel, expressed a preliminary view he later adopted — that he should not "whip the State in the presence of the jury."  That is, the judge stated that he would not give the point-by-point recitation of what was theorized in the prosecutor's opening and what the State failed to prove because "[a]ll that's going to do is change the level of the playing field."  The judge then stated during this colloquy that he would instruct the jury that the things attorneys say in openings and closings are not evidence and "any comments should be disregarded if they're in conflict with the evidence," repeating that "[i]t really would be unfair to do anything else."

Samad's attorney lastly asserted in response that, "absent asking for a mistrial," a remedy he and co-counsel repeatedly eschewed, he was concerned about a failure of the judge to specifically instruct the jury to disregard the prosecutor's comment in opening that Burgess told Watkins he was shot:

A-1906-11T2

[H]earing evidence from the dead man's mouth is extremely prejudicial. . . . With particularity I want that comment singled out. Never happened, isn't in this record, totally disregard it. . . . I don't think that's offensive to [Martell's] position. That's the one bell that needs to be unrung more than any other. That would be my request.

THE COURT: I hear you. Again, to focus like that would potentially give the jury the impression that the [c]ourt was not being impartial. Because ultimately it's wagging my finger at the State. So I don't really think that singling out any comment by the [c]ourt — now certainly I'm not going to foreclose your arguments that the investigation was shoddy, rush-to-judgment type of stuff or that the State made these wild claims and never came through. I can't stop you from doing that. But I'm not going to give any lawyer the upper hand or opportunity to use what the [c]ourt says as a lever to secure an upper hand on your adversary. That would be grossly unfair. Again, my job is to keep a level playing field. Now, I grant you, some of those statements are rather precise and in light of the evidence that I've heard or lack thereof, somewhat troubling. But, again, nobody is disputing [the prosecutor] acted in good faith.

Martell's counsel concurred with the particular instruction sought by Samad's counsel, who continued to argue, in response to the judge's belief in the importance of his appearing to the jury to be impartial, that:

The prosecutor created this problem. Whether you begin to craft a curative or don't craft one and you say you don't want to give an advantage to one attorney or the

29

other, you're not. She [the prosecutor] did. She put the comments on the record, not you. Your job as umpire, for want of a better description, is to call it down the middle. One side has created a problem. If the charge you have to give hurts that side, if they created the problem, it's the rights of Samad Land I'm concerned with, Judge, and they've been abridged. May I stand up in my closing and put a bunch of things that are not part of the record into the record? Of course I can't. Why isn't it a level playing field? That's what the prosecutor did. I'm asking for relief.

The judge rejected this plea as well:

So in this particular instance, although it was a little bit predictable that Watkins was not going to testify, despite the fact he did have immunity, certainly nobody is questioning [the prosecutor's] good faith in this particular instance.

And, in the end, the judge only charged on this aspect that what attorneys say in their opening and closing statements is not evidence:

Arguments, statements, remarks, openings and summations or closings of counsel are not evidence and must not be treated as evidence. Although the attorneys might have pointed out what they thought was important in this case, you must rely solely upon your understanding and recollection of the evidence that was admitted during the trial. Whether or not a defendant has been proven guilty beyond a reasonable doubt is for you to determine based on all of the evidence presented during the trial. Any comments by attorneys is not controlling. It's your sworn duty to arrive at a just conclusion after considering all of the evidence which

30                                                      A-1906-11T2

was presented during the course of the trial.

Defendants were acquitted of murder and attempted murder but convicted of aggravated manslaughter and weapons offenses. Their motions for a new trial, which also relied on a reiteration of the arguments posed by counsel at trial regarding the prosecutor's opening statement, were denied.

IV

To repeat, defendants claim the right to a new trial because the prosecutor's opening statement articulated a theory of defendants' culpability based on a detailed description of evidence never presented. In responding to this, the State recognizes that "under the circumstances and with the benefit of hindsight it may have been more prudent for the prosecutor to restrict her opening comments regarding Watkins'[s] anticipated testimony," but the State also insists that the prosecutor did not act in bad faith and that defendants were not harmed.

The principles we apply are familiar. A prosecutor's opening statement "should provide an outline or roadmap of the State's case" and "should be limited to a <u>general</u> recital of what the State expects, in good faith, to prove by competent evidence." <u>State v. Walden</u>, 370 <u>N.J. Super.</u> 549, 558 (App. Div.), <u>certif. denied</u>, 182 <u>N.J.</u> 148 (2004). Both at trial and

31                                    A-1906-11T2

in its arguments in this court, the State chiefly emphasizes the lack of any evidence of the prosecutor's bad faith. The absence of bad faith, however, does not provide quite the shield the State suggests. The principles espoused in our case law regarding consideration of a prosecutor's good faith arise from a concern that not every statement by a prosecutor at variance with the proofs should constitute grounds for reversal and that the public should not suffer the consequences of a reversal "because of a prosecutor's dereliction." State v. Torres, 328 N.J. Super. 77, 94 (App. Div. 2000).

As revealed by the colloquy from which we have liberally quoted, at the time the opening was delivered there was considerable reason to doubt whether Watkins would testify.[15] No one doubted then — or now — that without Watkins much of what the prosecutor asserted during her opening could not be proven. The prosecutor provided extensive details of defendants' alleged "grudge" against Watkins and the other specific allegations never proven when only an outline or a roadmap of what the State intended to prove was required. The State's ill-advised opening demonstrated a level of imprudence that cannot be tolerated when pitted against defendants' right to a fair trial. In other

---

[15]The experienced trial judge made this observation on a number of occasions throughout the trial.

words, as we held in the quite similar cases of <u>Torres</u> and <u>Walden</u>, a new trial will be required as the only sensible means of redressing the prejudice caused to defendants even when actual bad faith may be absent. <u>Walden</u>, <u>supra</u>, 370 <u>N.J. Super.</u> at 558 (holding that even if "the prosecutor acted in good faith . . ., he made the prejudicial statement at his peril"); <u>Torres</u>, <u>supra</u>, 328 <u>N.J. Super.</u> at 94-95 (recognizing that a new trial will be required in such instances, even in the absence of bad faith, because there are means through which the prosecutor could have avoided the risk). Defendants should not bear the consequences of the prosecutor's poor judgment in assuming Watkins's availability; to the contrary, the impact of such an event on the jury's consideration of the issues should be resolved in favor of the accused if our dedication to the right to a fair trial is to have any meaning.

We reject the State's argument that the prejudice was lessened by the judge's instructions to the jury that the attorneys' statements did not constitute evidence. We appreciate the judge's attempts to be fair and impartial. But, despite that intent, the field had already been tilted by the State when the prosecutor uttered unnecessarily detailed and eventually unproved factual allegations. Ultimately, we conclude that no instruction — not even a point-by-point

description, which the judge refused to give, of the things the State had promised but failed to prove — could have righted things. We emphasize that, in like circumstances, a trial judge should endeavor to level the playing field even if it results in providing instructions that might appear critical to the party that, like the prosecutor here, had given an opening statement replete with descriptions of facts never supported.

We also reject the notions that the jury's acquittal of both defendants on the first-degree murder charge demonstrates it was not influenced by the improper opening statement or that the jury fully adhered to the judge's general instruction about attorneys' statements. As we have observed, the entire tenor of the trial was skewed by the State's description during opening statements of the facts that would be elicited from Watkins. Without Watkins, the State was left to prove defendants' culpability through the limited evidence provided by Melissa Gonzalez, the testimony of Diana Stratton Green, who, at the time she testified, had been indicted by the same prosecutor's office for making a false report to police in another matter, and whose credibility was otherwise seriously questioned, and whatever inferences the jury could draw from the testimony of law enforcement officers and the videotape gathered from two locations, which we have previously described.

It is enough that the opening statement could have contributed to the verdict to warrant a new trial where, as we have demonstrated, the evidence of guilt was far from overwhelming. See State v. Bradshaw, 392 N.J. Super. 425, 438-39 (App. Div. 2007), aff'd on other grounds, 195 N.J. 493 (2008). In taking pains to examine the entire factual record in evaluating the "capacity" of the opening statement to have an "improper impact," State v. Johnson, 46 N.J. 289, 291 (1966), we are compelled to conclude that the judge's general instruction — that what attorneys say is not evidence — "did not remove the prejudicial effect" of the prosecutor's unproven factual allegations "from the minds of the jury," State v. Bankston, 63 N.J. 263, 272 (1973).[16] Our dedication to a criminal justice

---

[16]Much has been written about the impact of opening statements on juries, see Shari Seidman Diamond et al., Juror Reactions To Attorneys At Trial, 87 J. Crim. L. & Criminology 17, 27-28 (1996), and many experienced attorneys have expressed their view that cases are won and lost at this stage, id. at 27 n.29; see also Donald E. Vinson, The Psychology of Winning Strategy 171 (1986) (asserting that "research on the impact of the opening statement consistently reveals that as many as 80 to 90 percent of all jurors have reached their ultimate verdict during or immediately after opening statements"). Studies have also suggested "opening statements inconsistent with the evidence may influence verdicts by causing jurors to recall the evidence inaccurately." Diamond, supra, at 28 (citing Thomas A. Pyszczynski et al., Opening Statements in a Jury Trial: The Effect of Promising More Than the Evidence Can Show, 11 J. Applied Soc. Psychol. 434, 435 (1981)).

system that values an accused's right to a fair trial requires nothing less than a new trial.

In the final analysis, events were set in motion when the prosecutor incautiously made extensive representations to the jury that the State would prove certain facts that could only be proven through the testimony of a witness she had reason to believe would not appear. Those factual assertions, which mischaracterized the nature and quality of the State's proofs, imperiled defendants' right to a fair trial. In reaching this conclusion, we must recognize that the prosecutor's arguments to the jury were not those of any ordinary advocate. The prosecutor "represents the State whose interest is served by an untainted judgment firmly rooted in facts alone." State v. West, 29 N.J. 327, 338 (1959). And, while prosecutors, "within reasonable limits, are afforded considerable leeway in making opening statements," State v. Williams, 113 N.J. 393, 447 (1988), ultimately prosecutors are "obligat[ed] . . . to seek a fair trial," West, supra, 29 N.J. at 338, not just convictions. That is the prosecutor's obligation. Our obligation is to ensure that every individual accused of a crime is provided with a fair trial.

The prosecutor's opening statement caused the scales to careen toward the State's side by allowing the jury to

anticipate and perhaps even assume the truth of those assertions. The judge's instructions to the jury did not ameliorate, and it is unlikely that any additional instructions could have ameliorated, the prejudice caused by the prosecutor. Simple justice and the appearance that justice is being done compel the awarding of a new trial to both defendants.

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1906-11T2