**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1382-15T1
A-1614-15T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CAREY R. GREENE and
TYLEEK A. LEWIS,

     Defendants-Appellants.

_____

Submitted December 5, 2018 – Decided January 28, 2019

Before Judges Koblitz, Ostrer and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 14-08-0877.

Joseph E. Krakora, Public Defender, attorney for appellant Carey R. Greene (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Tyleek A. Lewis (Michael J. Confusione, Designated Counsel, on the brief).

Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the briefs).

Appellant Tyleek A. Lewis filed a pro se supplemental brief.

PER CURIAM

Defendants Carey R. Greene and Tyleek A. Lewis appeal from their convictions of first-degree murder of Edward Baker while in the course of a robbery, N.J.S.A. 2C:11-3(a)(3) (count one); first-degree murder of Baker while in the course of a burglary, N.J.S.A. 2C:11-3(a)(3) (count two); first-degree robbery for inflicting injury upon Baker in the course of committing a theft while armed with a deadly weapon, N.J.S.A. 2C:15-1(a)(1) (count three); and second-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count four). They were sentenced simultaneously[1] to terms of thirty-five years in prison subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7. We write one opinion to resolve both appeals, and reverse and remand for a new trial because the State told the jury in its opening statement that Greene had confessed to his grandmother, who never testified. The State's disclosure was too prejudicial to both defendants to be remedied by the court's cautionary instruction.

---

[1] We note that simultaneous sentencing is not authorized by the criminal code.

The State presented the following sequence of events. In the evening of July 16, 2010, Greene, Lewis, Toney Holliday[2] and a minor, A.J., had been driving around Pemberton and Mount Holly, New Jersey in an attempt to obtain marijuana. They stopped at a gas station and then a Wawa near Baker's Westampton home. All four individuals entered the Wawa to purchase drinks. Security footage taken at the Wawa showed A.J., Greene, and Lewis. Greene was wearing a white T-shirt.[3] A.J. said Greene had visible tattoos up and down both arms. While at the Wawa, they collectively decided to commit a robbery. Lewis drove all four individuals to Baker's home. After exiting the car, Greene and Lewis armed themselves with guns from a black book bag. All four individuals covered their faces with black bandanas. At the time, Lewis was wearing a hat that was red and grey with a letter "P" on it. Greene, Lewis, and Holliday entered the house, while A.J. stood outside of the house. A short time later, Holliday came out of the house and waited outside with A.J.

---

[2] Holliday was tried with Greene and Lewis. The jury was unable to decide Holliday's case and the judge declared a mistrial as to Holliday.

[3] The videotape was not provided to us, but defense counsel commented on Greene's white T-shirt in his summation, despite the State's key witness, Ariel Dickens, testifying that Greene was wearing an Ed Hardy shirt, "something you hardly confuse."

A-1382-15T1

Meanwhile, Baker was at his home with two women, Ariel Dickens, who testified at trial, and another woman, who did not testify. Dickens said that on that evening, Baker smoked marijuana and Dickens had one beer. While they were sitting at the dining room table, two men entered the home with guns and yelled for Baker to give them his "shit."

Dickens observed that one man wore a reddish-orange t-shirt and had no tattoos, while the other man wore a black polo shirt. Both men wore triangular black masks that tied behind their heads. She had a good opportunity to look at both men and noticed that both were African-American. Although she gave only an approximation of his first name to police, she claimed to recognize one man as Greene, because she had seen pictures of him on social media five years before. She identified Greene through one photograph shown by police, and said she was not "a hundred percent sure." She was caught in various contradictions on cross-examination.

Baker stood up and confronted the two men, while Dickens and the other woman ran out of the home through the back door. As Dickens was running, she turned her head and saw Baker push one of the men. A few moments later, she heard a gunshot.

4

Dickens re-entered Baker's home through the backdoor a few seconds after hearing the gunshot. Baker stumbled towards her from the front door, fell to the ground, and had difficulty breathing. She observed blood on Baker's shirt near his stomach.

The jury heard the 911 call placed by Dickens, in which she stated that a person was shot at Baker's home after a robbery. She said she did not know who the robbers were, but that two men wearing black masks fled in a black car.

At trial, Officer Ralph Lutz testified the police found money, drugs and a shell casing on the floor. A large amount of marijuana contained in a shoebox was also found at the victim's home.

Michael Wiltsey, the primary crime scene investigator with the Burlington County Prosecutor's Office, testified that a Jesus pendant with a broken clasp was found on the floor of the living room, and a red and grey Phillies baseball cap on the walkway outside of the front door. Wiltsey believed that the hat had blood on the back of it. A grey, green, and black Nike sneaker was discovered on a mulch bed directly in front of the home. DNA profiles generated from the items showed that Lewis was the source of DNA retrieved from the sweat band of the hat.

A-1382-15T1

A.J. testified that he pled guilty to involuntary manslaughter and agreed to give "truthful testimony" as part of the plea agreement. In exchange, the State recommended a seven-year sentence. A.J. testified the hat recovered at the scene looked like Lewis's hat. A.J. also said the shoe recovered by police looked like Holliday's shoe. A.J. testified he heard a single gunshot from his position outside of the home. Afterwards, all four individuals ran to the car and drove to Greene's grandmother's home in Willingboro, where Greene entered the home by himself. According to A.J., Lewis was no longer wearing his hat when he exited Baker's home. A.J. was cross-examined on his criminal behavior since the plea four years ago, his drug involvement and his boastful, aggressive Facebook posts.

None of the defendants testified.

Greene argues on appeal:

> POINT I: THE PROSECUTOR COMMITTED MISCONDUCT BY INCORRECTLY REPRESENTING THAT THE STATE WOULD PRESENT EVIDENCE THAT THE DEFENDANT HAD CONFESSED, AND THE TRIAL COURT'S REMEDIAL INSTRUCTION WAS INADEQUATE, NECESSITATING REVERSAL.
>
> A. THE PROSECUTOR'S FAILURE TO PRESENT TESTIMONY THAT THE DEFENDANT CONFESSED, AFTER REPRESENTING IN OPENING THAT HE WOULD DO SO.

B.    THE TRIAL COURT'S REMEDIATION WAS INADEQUATE.

POINT II:   THE PROSECUTOR REPEATEDLY MISSTATED THE LAW TO DEFENDANT'S PREJUDICE, AND ACCORDINGLY COMMITTED MISCONDUCT, BY REPEATEDLY CHARACTERIZING THE TRIAL AS A "SEARCH FOR TRUTH." U.S. CONST., AMEND. IX; N.J. CONST., ART. 1, PAR.[4]

POINT III:   THE PROSECUTOR ERRED TO DEFENDANT'S PREJUDICE BY FALSELY CLAIMING IN SUMMATION, IN A FELONY-MURDER CASE, THAT A PENDANT HAD BEEN TAKEN FROM THE VICTIM.

POINT IV:   THE TRIAL COURT'S WRITTEN CHARGE WAS INCOMPLETE IN SIGNIFICANT RESPECTS, COMPELLING THE CONCLUSION THAT THE JURY WAS IMPROPERLY INSTRUCTED.

POINT V:   THE TRIAL COURT ERRED PREJUDICIALLY IN DENYING A REQUESTED WADE HEARING AS TO A WITNESS WHO IDENTIFIED THE DEFENDANT.

POINT VI:   THE CUMULATION OF ERRORS REQUIRES REVERSAL.

POINT VII:   THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.

---

[4]  Defendant does not state the paragraph number in the point heading or his brief.

A-1382-15T1

Lewis argues through counsel on appeal:

> POINT I: THE PROSECUTOR VIOLATED <u>STATE v. LAND</u>, 435 N.J. SUPER. 249, 269 (APP. DIV. 2014), WARRANTING REVERSAL AND REMAND FOR A NEW TRIAL.
>
> POINT II: THE PROSECUTOR WENT BEYOND FAIR COMMENT ON THE EVIDENCE IN SUMMATION.
>
> POINT III: THE TRIAL COURT ERRED IN ADMITTING THE WAWA VIDEOTAPE INTO EVIDENCE.
>
> POINT IV: THE TRIAL COURT INFRINGED DEFENDANT'S RIGHT TO DISCOVERY AND CROSS-EXAMINATION.
>
> POINT V: THE TRIAL COURT ERRED IN DENYING A POST-VERDICT INTERVIEW OF A COMPROMISED JUROR.
>
> POINT VI: DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

Lewis argues in his pro se supplemental brief:[5]

> POINT I: IT WAS REVERSIBLE ERROR FOR THE JUDGE TO FAIL TO INSTRUCT THE JURY ON ACCOMPLICE LIABILITY, ESPECIALLY IN LIGHT OF THE JURY'S QUESTION SIGNALING ITS CONFUSION.

---

[5] We corrected minor typographical errors.

Greene and Lewis argue that the assistant prosecutor violated State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014), when he informed the jury in his opening statement that it would be hearing testimony from Ethel Smith, Greene's grandmother. They contend that the assistant prosecutor knew that Smith might not testify and that his comments about her anticipated testimony were prejudicial. Additionally, Greene argues that the court's remedial jury charge was inadequate.

## I. Pre-Trial Proceedings.

Prior to the start of trial, the court granted the State's motion for a Gross[6] hearing regarding the admissibility of Smith's testimony. At the Gross hearing on November 12, 2014, Detective Jayson Abadia testified that Smith made a tape-recorded statement to police in which she stated that Greene confessed to her that he shot the victim by accident. Abadia testified that she later changed her statement and refused to return his calls. Smith appeared at the hearing and testified that her recorded statement to police, stating Greene told her he went to buy marijuana from the victim and the gun accidentally discharged, was false.

---

[6] State v. Gross, 121 N.J. 1 (1990). A Gross hearing is also called a N.J.R.E. 803(a)(1) hearing. See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1(a) on N.J.R.E. 803(a)(1) (2018).

She testified Greene never said that to her, and she had lied to police in an effort to "help him by saying that it was an accident if he was involved in it."

The court held that Smith's statement was reliable pursuant to Gross, 121 N.J. at 10, 17. Smith was served with a material witness order, which required her to appear for trial. That same day, in anticipation of Smith's testimony, the court held a Bruton[7] hearing regarding the redaction of Smith's statement so that references to Lewis and Holliday could be removed.

The State expressed concern that Smith would invoke her Fifth Amendment right to remain silent and explained that the assistant prosecutor intended to discuss Smith's statement during openings. The court granted the State's request to conduct a Rule 104 hearing. N.J.R.E. 104(a).

On January 15, 2015, the court conducted the Rule 104 hearing. Although defendants were present, they were not permitted to ask questions or present argument. The court heard testimony from Smith. When asked if she recalled giving a statement to Abadia regarding a conversation she had with Greene, she refused to answer and invoked her Fifth Amendment right to remain silent. The State played the tape recording of Smith's prior statement to Abadia. In the recording, Smith told Abadia that Greene went to the victim's home to buy drugs,

---

[7] Bruton v. United States, 391 U.S. 123, 132 (1968).

there was a scuffle over the gun, and the gun discharged. After admitting that her voice was on the tape, she refused to answer further questions. Her basis for refusing to answer was "because a lot of things in that statement is false." She refused to explain any other basis upon which she was asserting her Fifth Amendment right other than to state that she did not want to provide false testimony. On January 20, 2015, the court held that Smith would be compelled to testify at trial and that she could not invoke her Fifth Amendment privilege.

## II. Trial.

During his opening on January 22, 2015, the assistant prosecutor stated:

> The evidence is going to show that when these four individuals got back in the car, they went to Willingboro. They didn't go back to Pemberton, they went to Willingboro. Specifically they went to where Carey Rasheed Greene's grandmother, maternal grandmother lived. Her name is Mrs. Ethel Smith. And you're going to meet Mrs. Smith during the course of this trial.
>
> And I just want to say a few words about Mrs. Smith. Mrs. Smith, I don't think it's a stretch to say, is in a difficult position. You see, because sometime after this event, the police went to Mrs. Smith's house, serve [sic] some legal papers, and Mrs. Smith got to talking to one of the detectives from the Burlington County Prosecutor's Office and she agreed to give a taped statement to that detective. His name is Jason [sic] Abadia and you're going to hear from Mrs. Smith what she said to Detective Abadia and I submit that what she said during this taped statement to Detective Abadia

11

was that at some point after the events of July 16th, she had the opportunity to talk with her grandson, Mr. Greene. In fact, Mr. Greene came over to her house and he was very upset and he told his grandmother what happened on July 16th, 2010. He told his grandmother he went to that house, that he had a gun, that there was a struggle between him and Eddy Baker, and that Eddy Baker got shot. . . .

Now, Mrs. Smith is in a difficult position. She's in the position stuck between the love of her grandson and testifying in court and that's a tough, that's a tough position for Mrs. Smith. I understand that it's a difficult position for her and I just hope that when Mrs. Smith comes to the witness stand you too will appreciate the situation that she's in in testifying here in court.

On February 3, 2015, the court held a Rule 104 hearing in connection with the State's motion to admit the out-of-court statement of Smith pursuant to either Rule 804(b)(9), as a forfeiture by wrongdoing hearsay exception, or Rule 804(b)(1)(A), as the prior testimony of a witness. N.J.R.E. 804.

Abadia testified for the State. He explained that he appeared at Smith's home to serve legal paperwork in September 2010, that they started talking, and that she provided a taped statement to police. In September 2014, he tried calling Smith again to advise her that the trial date was approaching. She did not return his calls. He also detailed additional attempts to contact Smith and explained that she was ultimately served with a court order to appear at trial.

12

The following day, Abadia was able to reach Smith who told him that she would not be attending the trial and that her initial statement was a lie.

Smith appeared at the hearing, refused to be sworn in, claimed that her prior statement was a lie, and did not answer questions. The court denied the State's Rule 804(b)(9) motion, explaining that although Smith refused to make herself available for trial, there was no evidence that Greene was responsible for Smith's unavailability. Also, defendants were not permitted to cross-examine Smith during the Gross hearing and the scope of the Gross hearing was more limited than trial testimony. We granted the State leave to appeal and summarily affirmed the decision of the trial court. State v. Holliday, No. A-4327-14 (App. Div. Feb. 11, 2015) (slip op. at 1).

At trial, but outside of the presence of the jury, the State called Smith as a witness. Smith refused to be sworn in, refused to answer questions from the State and claimed she lied in her police statement. The court held Smith in contempt of court. Smith did not testify at trial, nor was her statement admitted.

During the jury charge, the court provided the following remedial instruction:

> The arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence. In that regard, during opening statements, the prosecutor indicated that you would

> hear testimony from Ethel Smith. Ethel Smith did not testify in this case. Any statements the prosecutor made regarding Ethel Smith is [sic] not evidence and cannot be considered by you in your deliberations.

At trial, Greene's counsel did not object to the curative instruction, which was consistent with counsel's requested instruction.

### III. Opening statement.

In <u>Land</u>, 435 N.J. Super. at 250-52, we reversed and remanded a matter in which two criminal defendants failed to receive a fair trial in light of repetitive, unsupported descriptions of facts made by the prosecutor during her opening statement. <u>Id.</u> at 265-66. The prosecutor told the jury several times that they would hear testimony from a witness who never testified despite a grant of immunity. <u>Id.</u> at 250-52, 257. The prosecutor attempted to prove the allegations against the defendants, including the charge of attempted murder, through other competent evidence. <u>Id.</u> at 258.

We noted that the prosecutor's opening statement in <u>Land</u> was "replete" with descriptions of facts that were never supported. <u>Id.</u> at 270-71. Also, the evidence the State presented in that case was "less than overwhelming." <u>Id.</u> at 250. At the time the prosecutor made the statements during the openings, there was considerable reason to doubt whether the victim would testify. <u>Id.</u> at 269-70. Even if a prosecutor acts in good faith, he or she makes the prejudicial

statements at his or her own peril.  <u>Id.</u> at 270.  As a result, we reversed and remanded, holding that the defendants did not receive a fair trial.  <u>Id.</u> at 250, 273.

On appeal, Greene contends the State's unequivocal statement that Smith would testify Greene confessed to her was a direct violation of <u>Land</u>. The assistant prosecutor expounded in detail about Smith's forthcoming testimony, telling the jury Smith would explain that Greene confessed to shooting Baker and the details of what happened.  There was a strong indication prior to opening statements that Smith would refuse to testify.  In fact, the assistant prosecutor was aware that Smith stated she would be invoking her Fifth Amendment right.

The assistant prosecutor did not yet know whether the court would admit Smith's statement through another mechanism because it had not ruled on the State's motion to admit the out-of-court statement of Smith pursuant to either Rule 804 (b)(9) or Rule 804(b)(1)(A).  The assistant prosecutor had specific knowledge that Smith could well refuse to testify.

While defense counsel did not object during the opening statement when the assistant prosecutor spoke of Smith's testimony, under <u>Land</u> a prosecutor's good faith belief about whether or not someone will testify is not crucial because

15

a prosecutor makes representations in opening statements at his or her own peril. Id. at 270.

## IV. Curative instruction.

Not only did the assistant prosecutor violate Land based upon the remarks he made during opening statements, but the court's curative instruction was inadequate because it could not remediate the prejudice that defendants experienced when the assistant prosecutor told the jury Greene confessed to his grandmother.

The assistant prosecutor told the jury they would be hearing testimony from Smith that Greene confessed to her. Greatly amplifying the harm, he told the jury that Smith was in a difficult position because she was "stuck between the love of her grandson and testifying in court." As a result, the jury was expecting either that Smith would testify Greene confessed to her, or Smith would fail to testify because she loved Greene too much to reveal his confession. After Smith failed to testify, the jury may well have concluded that Greene had confessed to Smith, but she did not want to present evidence against her grandson. Such compelling harm to Greene also infected Lewis' trial. As a result, the court's instruction to disregard the assistant prosecutor's statements about Smith was woefully inadequate. The court could not "unring the bell"

sounded by the assistant prosecutor.  See State v. W.L. 292 N.J. Super. 100, 116 (App. Div. 1996) (quoting Demers v. Snyder, 282 N.J. Super. 50, 58 (App. Div. 1995)) (noting curative instructions are "not always palliative or sufficient to mitigate the damage").

Due to the additional commentary regarding why Smith might not choose to testify, the court's instruction failed to cure the prejudice to defendants.  Nor would any other formulation of the instruction have erased the damage done by the assistant prosecutor's opening statement.  The opening not only disclosed extremely damaging testimony that did not materialize, but it also disclosed the reason why the testimony might not be heard.  This raises a "reasonable doubt" that it caused the jury to reach a result it would not have reached otherwise, especially in light of the hung jury on the third co-defendant.  See State v. Walden 370 N.J. Super. 549, 555-56, 561-62 (App. Div. 2004) (reversing where the prosecutor recounted to the jury the statement of a witness that "[the defendant] was the shooter," when the witness did not testify, and the prosecutor then vouched for the honesty of a second witness in light of the non-testifying witness's statement).

Wawa surveillance video showed all four individuals at a location near Baker's home.  A.J. testified that Lewis and Greene entered Baker's home armed

with guns. Dickens testified that an armed man she recognized as Greene had an altercation with Baker. Both A.J. and Dickens testified that they heard a gunshot while Greene and Lewis were in the home, and Baker died of a gunshot wound shortly after the four individuals fled. Moreover, there was DNA evidence linking Lewis and Holliday to the scene. But, Greene was wearing a white shirt in the Wawa security footage and had tattoos, contrary to Dickens' testimony that the shooter was wearing a red shirt and had no tattoos. Her testimony that she recognized Greene from five-year-old Facebook pages was also not compelling evidence. A.J. was undercut by his lack of overall credibility. Thus, although there was strong evidence of Greene's and Lewis's guilt, it was not undisputed. The jury did not find Holliday guilty. Due to the contradictory exculpating evidence here, similar to Land, "[w]e cannot say -- in light of the less than overwhelming evidence of guilt -- that the prosecutor's imprudent comments, even if made in good faith, failed to prejudice defendants." 435 N.J. Super at 250. The jury could have concluded that Greene and Lewis were guilty independent of the prosecutor's unfounded opening remarks and the court's inadequate curative instruction. We cannot say, however, that beyond a reasonable doubt the jury was not infected by the State's improper opening statement.

Reversed and remanded for further proceedings.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION