**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1275-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GERALD W. BUTLER,

     Defendant-Appellant.

_____

Argued March 6, 2024 – Decided December 31, 2024

Before Judges Accurso, Vernoia and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 18-03-0266.

Alison Gifford, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Elizabeth C. Jarit, Deputy Public Defender, of counsel and on the brief).

Jeffrey Krachun, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Jeffrey Krachun, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Defendant Gerald W. Butler appeals from his convictions for conspiracy and various drug-related offenses, including possession of a controlled dangerous substance with intent to distribute, distribution of CDS, and his aggregate fifteen-year sentence.  He claims the trial was tainted by the prosecutor's opening and closing statements comparing his conduct to that depicted in the television show The Wire, compounded by the repeated testimony suggesting he was a part of a violent network of organized crime, although the evidence was insufficient to demonstrate a conspiracy, and that the court erred by violating a witness's privilege against self-incrimination, permitting a police officer to testify he had observed what he believed to be a narcotics transaction, allowing an unreliable in-court identification, failing to properly instruct the jury on identification, and imposing an excessive and otherwise incorrect sentence.

Having considered the record, the parties' arguments, and the applicable law, we reverse defendant's conviction for conspiracy to distribute CDS, affirm his remaining convictions, vacate his sentence, and remand for resentencing.

A-1275-22

In 2017, a Cumberland County Grand Jury returned a forty-three-count indictment against twenty-one people, including defendant and co-defendants Adam Yurdock, Rafael Gonzalez, and Joshua Phillips, alleging various weapons and narcotics offenses arising out of an investigation dubbed "Operation That's All Folks." Yurdock was admitted into Pretrial Intervention; Gonzalez pleaded guilty to second-degree possession of a firearm while committing a CDS offense, receiving a five-year sentence with a year of parole ineligibility; and Phillips received probation following his guilty plea to third-degree possession of CDS.

The prosecutor dismissed the charges against defendant on her own motion, and he was subsequently charged in a stand-alone indictment with: second-degree conspiracy to possess a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:35-5(b)(2) (count one); third-degree conspiracy to distribute CDS, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:35-5(b)(3) (count two); third-degree distribution of CDS, N.J.S.A. 2C:35-5(b)(3) (count three); two counts of third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1) (counts four and seven); second-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(b)(2) (count five); second-degree possession of a weapon while committing a CDS offense, N.J.S.A.

3

2C:39-4.1 (count six); and second-degree certain persons not to possess a weapon, N.J.S.A. 2C:39-7(b)(1) (count eight).

From April 2016 through its conclusion in September, Sergeant Ryan Breslin of the Cumberland County Prosecutor's Office served as the lead agent on a "large scale weapons trafficking and narcotics investigation out of Millville." The investigation, "Operation That's All Folks," was carried out by the Organized Crime Bureau, the purpose of which was "to conduct proactive investigations into narcotic trafficking within the County." The goal was to "target individuals that had been involved in violence in the city of Millville, as well as weapons trafficking throughout the county."

The investigation began after the police "received information" that there had been several "connected" shootings in Millville and matched "shell casings from different scenes." As their work progressed, the investigators "were able to identify an individual selling firearms in the County." They "targeted that individual as well as the other group that [they] believed to be involved in these shootings." The police obtained wiretaps and began "listening to calls" on three different phone lines, intercepting "hundreds of sessions."

A-1275-22

In late August or early September, the police attempted to conduct a firearm purchase from one of the targets of the investigation using an undercover officer. Although the purchase was not completed, the suspected seller called another number on September 6, 2016, asking "Hey, yo, when can I go get that from old boy?" Breslin searched that phone number on Facebook, which linked the number to a profile with the name "Fast Life Blizzy Ho."

Breslin testified the photo included in the "Fast Life Blizzy Ho" profile matched defendant and made an in-court identification of Butler as the person depicted in the profile. Screenshots of the Facebook profile were admitted in evidence and shown to the jury.

Breslin testified police "obtained authorization to intercept that phone line as well," and it "became its own target line." According to Breslin, police intercepted "[o]ver 50" calls from that line over "a period of 20 days" as well as text messages. The State played a series of calls from the intercepted line, which it alleged contained slang terms relating to drugs and reflected individual buyers seeking to purchase drugs from Butler. The State presented an expert in CDS distribution and networks, who testified to his understanding of the meaning of the "coded language" of the calls.

A-1275-22

On an incoming call to the line ending on September 12, 2016, an individual asks "if you could give me like a 20, a D, and a dime" and indicates "I'm in the Gardens now." On another incoming call from the same date, an individual asks "[h]ow much would you charge today like if I was going to get like a brick?" On an incoming call from September 21, 2016, an individual asks "can you bring me a band?" A September 23, 2016 caller asks "[y]o, you got soft or hard?" and then says, "I want a little bit of soft." Minutes later, on an incoming call from the same number, the caller says, "make that 60 D and 20 soft" and "I'm here now." In a follow-up from that same number, the recipient of the call tells the caller to "come around the corner" and park in "the first parking spot" "[o]n your right-hand side" to which the caller responds, "[a]ll right. Got it." On one incoming call, the caller asks, "Hi, Mr. Butler?" and the recipient responds, "Yes."

Lieutenant O'Neill, another member of the Organized Crime Bureau, listened to a call from September 11, 2016, and identified the voice on the call as Butler's. O'Neill testified he recognized defendant's voice because they'd had a thirty-five-minute conversation six years before, although he'd had no contact with Butler since then. According to O'Neill, defendant had identified

A-1275-22

himself in that prior conversation "as Gerald Butler" but confirmed his nickname was Blaze.

O'Neill admitted on cross-examination he knew prior to identifying Butler's voice on the call that investigators believed the phone line belonged to Butler and had also seen the Facebook profile matched to that phone number. O'Neill also admitted that despite making the voice identification in 2016, he did not create his report until 2020 when Breslin asked him to do so.

Breslin conducted surveillance "in Delsea Gardens and the Delsea Village apartment complex" during the weeks of September 11 and 18, 2016, during which he twice saw Butler enter apartment 16D. Breslin also saw Butler driving a Nissan Maxima registered to someone else who never came up in their investigation.

Lieutenant Hoydis, who was also a part of "Operation That's All Folks," conducted surveillance of the apartment complex in an unmarked car on September 23, 2016. From never closer than 100 yards away, Hoydis observed a driver of a Trans Am approach a driver of a Nissan in the parking lot. He never saw the person in the Nissan, did not see any money or drugs, and could not see either individual's hands. Nevertheless, Hoydis testified, more than once, that he "saw what [he] believed to be a narcotics transaction."

A-1275-22

Sergeant Rodriguez, who also worked with the Organized Crime Bureau on "Operation That's All Folks," pulled over and arrested the driver of the Trans Am, Joshua Phillips, who was found in possession of two wax bags containing heroin, and a rock substance suspected to be cocaine. Phillips testified he had told the officer at the time he was arrested that he knew the person who sold him the drugs only as "B — Blaze."

A year and a half later, Phillips identified the Facebook profile picture for the "Fast Life Blizzy Ho" account as Blaze, the person from whom he'd bought drugs. Phillips testified he was "on heavy drugs" when he made the out-of-court identification and could not remember if he had been shown "a bunch of photographs or if it was just that piece of paper." According to Phillips, the police "brought [him] in there, they showed [him] that photograph, asked [him] to sign it, brought up some names of some people and that was it." Phillips testified the police "mentioned Gerald, or Gerard Butler, however you say his first name, and then just kind of alluded to the fact that that's who Blaze was." Phillips testified he didn't know "what his real name was" and "was high enough to not care and just get the hell out of there."

At trial, Phillips confirmed he was in Delsea Gardens on September 23, 2016, "buying drugs" and driving a maroon, 1978 Pontiac Trans Am. He

8

testified he bought ten dollars' worth of "[c]rack and heroin" from "[s]omebody named Blaze." When asked if he saw Blaze in the courtroom, Phillips pointed to defendant as "someone that may or may not have been him."

"Operation That's All Folks" culminated on September 28, 2016, with arrests and searches, including of apartment 16D in Delsea Gardens, which targeted Butler. On entering the apartment, the police found Yurdock sitting on the couch in the living room with three children, one of whom was lying on the couch next to him. Police found a .38 caliber gun shoved in between the couch cushions. Yurdock had slept on the couch the night before and testified Butler had also stayed over. Butler was not present.

The search of the apartment revealed "narcotics, handguns, and some paperwork," along with various caliber bullets and three spent .38 cartridges. In addition to the gun in the couch, police recovered a .22 caliber revolver in the bedroom occupied by lessee Gonzalez, a plastic bag containing suspected crack cocaine, a plastic bag containing a "brownish powder," numerous empty blue wax folds, Gonzalez's lease for the apartment and some documents addressed to him. Police also recovered several bags of suspected cocaine in a kitchen cabinet along with two digital scales and fold bags. Of the suspected

9

drugs found in 16D, two bags cumulatively weighing 14.676 grams were tested and determined to contain heroin, and two other bags cumulatively weighing 20.362 grams were tested and determined to contain cocaine. Although both guns were sent to the State Police lab for testing, no fingerprints or DNA were recovered.

Yurdock knew Butler as "Blaze" and identified him at trial. Yurdock testified he'd stayed at "Rafael's" apartment in Delsea Gardens in September 2016. According to Yurdock, he'd slept over on the couch the night before the search and that Butler "was there" around that time. Yurdock testified Gonzalez only "showed up" after the police had started their search. Yurdock claimed the police told him they'd found a gun under the couch cushion but "[t]hat was it." Yurdock did not remember saying anything to the police after the search and "did not know guns were in the house." He did not remember anything about drugs being in the house and testified that nothing that was found in 16D belonged to him.

Gonzalez confirmed he was living in apartment 16D "[i]n Delsea Village" in 2016. He testified defendant was "[a]n old friend" who had "stayed at [his] house a few times." Gonzalez testified he got a phone call on September 28, 2016, "saying [his] house was being raided." When he arrived

10

at the apartment, the police had already conducted their search. Gonzalez testified he "found out after . . . it was a raid for . . . Butler and that's all [he] knew at the time."

According to Gonzalez, the police told him they had "found firearms, and drugs of course." He admitted one of the weapons was his but claimed he'd not seen the drugs or the other gun. Gonzalez, who pleaded guilty to second-degree possession of a firearm while committing a CDS offense, testified he was convicted of possessing the .22 caliber weapon but claimed he had it because he "was fearful for [his] life" after his friend had recently been killed in the apartment complex, which he described as "dangerous."

Gonzalez testified defendant had not stayed with him during September 2016, "Gerald never lived with [him]" and had not stayed with him the night before the search. Gonzalez claimed he did not know drugs were in the apartment, he was not selling drugs out of the apartment, and he didn't know to whom the drugs belonged.

In his interview with police on the day of the search, Gonzalez told police he had "let Gerald stay with [him] for a couple months," and said defendant had been living with him and sleeping on the couch. He told police the drugs were Butler's and that he kept his items in a "personal cabinet" in the

11

kitchen of 16D.  Gonzalez also told police that he'd seen Butler with a gun, specifically "a .38."

At trial, Gonzalez testified he "was so angry that Mr. Butler had got my house raided that I put the blame on him" and said "[w]hatever else was found in the house, and I knew it wasn't mine, I just put it on him because they were there for him."  He said he remembered only "bits and parts" from the interview with police because he "was completely in a shocked state of mind" and "was taking drugs" at the time.  When he saw the transcript of his police interview while he was in prison on his gun conviction, he "was shocked that, you know, I said some of these things" "[b]ecause it was like . . . I did this out of anger."

At the time of trial, Gonzalez remembered telling the police the .38 caliber gun was Butler's but did not remember saying the drugs belonged to him, that Butler was staying over on the couch, or that he kept items in the kitchen cabinet.  He maintained he had said those things to police only because he "was furious" at Butler for the raid.  Gonzalez testified he had never seen Butler with a gun.

On the same day apartment 16D was searched, Sergeant Cavagnaro of the Cumberland County Prosecutor's Office Organized Crime Bureau was

12

assigned to attempt to locate and arrest Butler. Cavagnaro found the Nissan "Butler was known to operate" outside a doctor's office. Butler and a pregnant woman exited the office, entered the Nissan, and drove away. The officers stopped the Nissan and arrested Butler, who was the passenger in the car, pursuant to an arrest warrant. A search incident revealed Butler was carrying $875.

When police discovered the driver of the Nissan, Tiffany Parker, had two active warrants, she was arrested as well. Police searched the Nissan the next day, finding three cell phones, an LG, a Cricket, and a Samsung. Besides Butler's identification documents, $25 and a t-shirt on the passenger side seat of the car with the words, "fast life," nothing else of note was recovered.

Detective Barber of the Cumberland County Prosecutor's Office was assigned to conduct extractions and review the data contents from the phones. Barber was not involved in the underlying operation and did not know to whom the phones belonged when he conducted the extractions, the results of which he provided to Breslin. Barber testified the Samsung phone "was protected with a pass code" so the police were "not able to extract any data" from that phone.

A-1275-22

Breslin testified there were messages on the LG phone from September 28, saying "they behind your house with dog and gun" and "they just raided 16D." A message from the day before read: "bro, this my new number . . . Blaze." The Facebook messenger account on the phone was for the username Fast Life Blizzy Ho. Breslin testified the cell tower data for the LG phone indicated that, at some point, it had been close to the Delsea Gardens apartment complex.

The extraction program showed the "device user" on the Cricket phone to be "Tiffany Parker" and contained messages with a person named "Blaze." "Fast Life Blizzy Ho" is listed as a contact. An incoming text message to the Cricket phone on September 23, from a contact saved as "Blaze," reads, "my new number." Parker engaged in a Facebook message exchange with Fast Life Blizzy Ho on September 27 during which she asked: "Are you coming to the doctor's tomorrow?"

The jury acquitted Butler of the gun charge, finding him guilty on all other counts. The court dismissed the certain-persons charge after the verdict.

At sentencing, the court found count one, second-degree conspiracy to possess CDS with intent to distribute, merged with count five, second-degree possession of CDS with intent to distribute; count two, third-degree conspiracy

14

to distribute CDS, merged with count three, third-degree distribution of CDS; and count seven, third-degree possession of CDS, merged with count five, second-degree possession of CDS with intent to distribute; leaving for sentencing purposes, count five, second-degree possession of CDS with intent to distribute and count three, third-degree distribution of CDS.

The court found the State had provided a copy of Butler's 2013 judgment of conviction for the manufacture and distribution of heroin and cocaine and that Butler's 2010 Cumberland County and 2011 Atlantic County convictions "[p]er the presentence report," left the court without discretion to deny the State's extended term motion under N.J.S.A. 2C:43-6(f).

The court found aggravating factors three, the risk that defendant will re-offend, N.J.S.A. 2C:44-1(a)(3); five, a substantial likelihood that the defendant is involved in organized criminal activity, N.J.S.A. 2C:44-1(a)(5); six, the extent and seriousness of defendant's offense history, N.J.S.A. 2C:44-1(a)(6); and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9); and no mitigating factors.

The court sentenced defendant to a fifteen-year extended term on count five, second-degree possession of CDS with intent to distribute, seven and a half years of which to be served without parole, concurrent to a five-year

sentence on count three, third-degree distribution of CDS, two and half years

of which to be served without parole.

Defendant presents the following points for our consideration:

POINT I
THE TRIAL WAS IRREPARABLY TAINTED BY
THE PROSECUTOR'S OPENING AND CLOSING
STATEMENTS COMPARING DEFENDANT'S
CONDUCT TO THAT DEPICTED ON HBO'S THE
WIRE, AS WELL AS THE REPEATED ADMISSION
OF IRRELEVANT AND HIGHLY PREJUDICIAL
TESTIMONY SUGGESTING THAT DEFENDANT
WAS PART OF A VIOLENT NETWORK OF
ORGANIZED CRIME RELATED TO SHOOTINGS
AND GUN TRAFFICKING.

A. The prosecutor's opening and closing statements
comparing the facts of the case to The Wire and
telling the jury that the investigation was "about gun
violence in the City of Millville" denied Butler due
process and a fair trial.

B. Trial testimony suggesting that Butler was involved
in shootings and other violent crimes investigated by
the Organized Crime Bureau and informing the jury
that the police obtained search and arrest warrants
targeting Butler was unduly prejudicial, denying
Butler due process and a fair trial.

C. These errors, alone and cumulatively, require
reversal.

POINT II
THE COURT'S THREAT TO JAIL A WITNESS TO
COMPEL THEM TO TESTIFY RESULTED IN A
VIOLATION OF THAT WITNESS'S PRIVILEGE

16

AGAINST SELF-INCRIMINATION AND THE ADMISSION OF UNRELIABLE TESTIMONY IN VIOLATION OF DEFENDANT'S DUE PROCESS RIGHTS AND FUNDAMENTAL FAIRNESS.

POINT III
THE OFFICER'S OPINION TESTIMONY THAT HE OBSERVED WHAT HE BELIEVED WAS A NARCOTICS TRANSACTION VIOLATED <u>MCLEAN</u> AND DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.  (Not raised below).

POINT IV
ADMISSION OF THE INHERENTLY UNRELIABLE IN-COURT IDENTIFICATION, THE PROVISION OF INADEUQATE IDENTIFICATION CHARGES, AND THE PROSECUTOR'S MISTATEMENT OF LAW IN SUMMATION THAT THE POLICE DID NOT HAVE TO FOLLOW THE <u>HENDERSON</u> FRAMEWORK, DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL. (Not raised below).

POINT V
PURSUANT TO WHARTON'S RULE, THE STATE'S EVIDENCE WAS LEGALLY INSUFFICIENT TO DEMONSTRATE A CONSPIRACY.  (Not raised below).

POINT VI
THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.  (Not raised below).

POINT VII
THE SENTENCE IMPOSED VIOLATES THE ATTORNEY GENERAL DIRECTIVE ELIMINATING MANDATORY MINIMUMS FOR

NON-VIOLENT DRUG OFFENSES, AS WELL AS DUE PROCESS AND OUR SENTENCING CODE, REQUIRING A REMAND FOR RESENTENCING.

A. The imposition of a mandatory minimum term of imprisonment violated Attorney General Law Enforcement Directive No. 2021-4 (hereafter "AG Directive").

B. Resentencing is additionally required because the court improperly found or failed to provide a valid basis for several aggravating factors, ignored applicable mitigating factors, and imposed a prohibited trial tax.

In her opening statement, the prosecutor referenced the television show, The Wire:

> You heard a little bit from the [j]udge about what this case was about. You heard about drugs. You heard about guns. But it's a little bigger than that, because all those guns and drugs go together. This is also a case about a phone intercept, what's also known as a wire.
>
> And there was a few years ago, many years ago now, that show on tv called The Wire. And in that show there was in Baltimore a rash of crime happening within the community. It seemed very organized. People were always at certain locations. They seemed to be following a hierarchy, or someone's orders. And they were trying to figure out how guns and drugs were coming into their community. And while they were trying to surveil all these different locations, they used all of the investigative means that they had available to them, they still weren't able to really crack down.

18

But they were eventually able to realize that there was a person they needed to focus on. The only way to really find out how the guns and drugs were flowing in the community was to get on that person's phone. So they got an intercept known as the wire.

That's similar to this case. Back in August to September 2016, in the city of Millville, the county prosecutor's office, specifically the Organized Crime Unit, got their own wire. And they did this because there was a rash of violence happening throughout Millville and throughout the summer of 2016.

The prosecutor concluded her opening statement by saying: "I end with this. That very much like the show The Wire, sometimes the targets tell on themselves." Defendant objected to the prosecutor's references to "pop culture" at the conclusion of her remarks. The court overruled the objection, stating it did not find the remarks "overly prejudicial."

The prosecutor did not reference The Wire in her closing. She told the jury:

> You learned that there was a huge, wide-scale operation, known as "That's All Folks," and you also know that Mr. Butler was not the initial target of that investigation, he kind of came up just out of the blue, and it was that first session you listened to this morning, and that drew their attention, because it's going to be up to you to determine what was that call about, in the context of the overall investigation, which you knew it was about gun violence in the City of Millville.

Defense counsel interposed no objection to the prosecutor's closing remarks.

An appellate court will reverse a conviction for prosecutorial misconduct only when the prosecutor's conduct was "clearly and unmistakably improper" and "so egregious" in the context of the trial as a whole that it deprived the defendant of a fair trial. State v. Pressley, 232 N.J. 587, 593 (2018). In making that assessment, we "take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." State v. Williams, 244 N.J. 592, 608 (2021) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). If after undertaking that review we are convinced "the remarks were sufficiently egregious, a new trial is appropriate, even in the face of overwhelming evidence that a defendant may, in fact, be guilty." State v. Smith, 212 N.J. 365, 404 (2012).

"A prosecutor's opening statement 'should provide an outline or roadmap of the State's case' and 'should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence.'" State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014) (quoting State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004)). "[W]hile prosecutors, 'within reasonable limits, are afforded considerable leeway in making opening statements,' ultimately prosecutors are 'obligat[ed] . . . to seek a fair trial,' . . . not just

convictions." Id. at 272 (first quoting State v. Williams, 113 N.J. 393, 447 (1988); then quoting State v. West, 29 N.J. 327, 338 (1959)).

Defendant argues the prosecutor's reference to The Wire "inflame[d] the jury and distract[ed] them from focusing on the evidence at trial" because the show was "one of the most violent television series ever produced, and one that depicted brutal murders, gang violence, and sexual assault." Although that may be true, the prosecutor did not reference any "brutal murders, gang violence, or sexual assault" in her opening. Instead, she used the reference to explain how the State had compiled the evidence it would present against defendant.

Having reviewed the opening statements, we're satisfied the prosecutor's purpose in referencing The Wire was not to inflame the jurors or divert them from the evidence but to reasonably introduce them to the concept of a wiretap, which was at the core of the State's case. Although a prosecutor must, of course, take care in choosing outside references in mapping the State's case, we find no error here in the prosecutor using the television show to explain that "sometimes the targets tell on themselves" and that in reading defendant's intercepted texts and listening to his calls they should focus on what defendant "is . . . telling you about what he's doing?"

21

As already noted, the prosecutor did not return to The Wire in closing. Defense counsel made no objection to the State's summation, and our review is thus only for plain error. State v. Alessi, 240 N.J. 501, 527 (2020). Although the prosecutor's statement about "Operation That's All Folks," being about "gun violence in the City of Millville" was unnecessary and improperly suggested defendant's involvement in wide-scale gun violence, we cannot find it approached the "high bar" of plain error. See State v. Santamaria, 236 N.J. 390, 404 (2019). The comment was fleeting, and the jury having acquitted defendant of the handgun offense, there is nothing to indicate the prosecutor's comment "led the jury to a result it otherwise might not have reached." State v. Dunbrack, 245 N.J. 531, 544 (2021).

We view likewise defendant's complaints about unobjected-to trial testimony suggesting defendant was "involved in shootings and other crimes investigated by the Organized Crime Bureau." Defendant did not object to Sergeant Breslin's testimony about the investigation of "large scale weapons trafficking" targeting violent individuals. Defendant argues the testimony constituted inadmissible N.J.R.E. 404(b) evidence, but Breslin made clear the unsuccessful undercover gun purchase that brought defendant to the attention of police "did not involve Mr. Butler" and was related to another target.

The testimony thus more broadly described only the impetus for the investigation that led to defendant's arrest. The State did not otherwise argue or suggest defendant was involved in weapons trafficking, and, again, the jury found him not guilty of the gun charge. The testimony was improper, but defendant provided the court no opportunity to address its admission with an objection, see State v. Marshall, 123 N.J. 1, 153 (1991), and it was not clearly capable of producing an unjust result, see Dunbrack, 245 N.J. at 544.

We reach the same conclusion as to the other evidence to which defendant did not object, including the testimony that locations other than apartment 16D were searched, defendant's girlfriend Parker had two active warrants, and there were search warrants for the apartment and the Nissan vehicles. If objections to the testimony had been made, in all likelihood they would have been properly granted. But there were no objections, the references were brief, and defendant does not make a strong showing that the testimony, either alone or in combination, was clearly capable of producing an unjust result.

Defendant's claim he was denied due process because Phillips was compelled to testify purportedly in violation of his rights to remain silent lacks

sufficient merit to warrant any extended discussion in a written opinion. See R. 2:11-3(e)(2).

When Phillips was called to testify by the State, he stated, "I'm going to invoke my right to the Fifth Amendment on every question you're about to ask me." The court excused the jury and "mov[ed] into a Rule 104 hearing." At the hearing, Phillips confirmed he had received a subpoena to testify but told the prosecutor "I indicated four years ago that if I wasn't getting anything out of this, I wasn't helping you do your job" and stated, "I'm not going to put that man in prison for no good reason, to help you when you can't help me. So I'm going to plead the Fifth from here on out."

The court told him "[t]hey can't do anything more against you related to this six-year-old transaction" to which Phillips responded, "Correct. I'm already sentenced to drug court for the violations, the whole nine. I'm currently doing that." Upon confirming the State had a prior recorded statement of Phillips, the judge concluded if Phillips was going to refuse to testify, his prior recorded statement could come in under N.J.R.E. 803(c)(25) as a statement against interest.

Defense counsel objected, claiming he was "basically . . . losing the right to cross-examine the witness," suggesting "there's always been the option to

24

hold somebody in contempt." The judge ultimately determined to "order that he has to testify and if he refuses to do so, as he's already indicated, he'll make himself unavailable. And then any admissions that he made previously to the police officers would be admissible under [N.J.R.E.] 804."

When Phillips resumed the stand, the court instructed:

> All right, Mr. Phillips. In a perfect world we'd have all the time in the world. I could hold you in contempt and send you to the county jail until you agree to testify in this case. I have the authority to do that. What I am going to do though is simply order you to testify. Now if I order you to testify are you going to continue to answer every question silently pleading the Fifth?
>
> [Phillips]: Doesn't the Fifth Amendment give me the right to not answer anything? Isn't that the way it works, and like I can't be punished for it? It's a right of mine.
>
> The court: No. Actually you've already been prosecuted, pled and sentenced for anything that had anything to do with that day. That day being a day in September of 2016. The State can't throw any new charges at you for anything that happened in September of 2016.
>
> [Phillips]: So you can hold me in county jail for the rest of my life until I agree to answer your questions.
>
> The court: I can hold you in county jail until another judge comes over and conducts a contempt proceeding. So if I order you to testify today, are you

25

going to continue to invoke your Fifth Amendment right against self-incrimination?

[Phillips]: No. I've got a job and bills and a life. Sorry, bud.

The court: So you are going to answer questions.

[Phillips]: Yeah. That's some dirty shit, but yes.

First, defendant's counsel invited the alleged error by suggesting that Phillips could be held in contempt for failing to testify. See State v. A.R., 213 N.J. 542, 561 (2013). And second, leaving aside that Phillips did not have a right to remain silent about his purchase of drugs from defendant because he could not be charged with any crimes arising out of the purchase, defendant does not have standing to assert Phillips's right to remain silent. See State v. Baum, 199 N.J. 407, 417 (2009).

Defendant correctly argues Lieutenant Hoydis improperly testified as a fact witness when he stated that he had observed defendant engage in a drug transaction. See State v. McLean, 205 N.J. 438, 460 (2011). Defendant, however, failed to object to the testimony, and there is other testimony, most notably Phillips's account that he was driving the Trans Am and bought heroin and cocaine from defendant that day, establishing the transaction about which

Hoydis testified. We find no grounds for reversal on the basis of Hoydis's testimony.

We also find no merit in defendant's argument the court erred by providing the Model Henderson instruction without any objection from defendant and without a request for additional instructions on system variables. See Model Jury Charges (Criminal), "Identification: In-Court and Out-Of-Court Identifications" (rev. May 18, 2020); State v. Henderson, 208 N.J. 208, 298-99 (2011). The instructions the court provided accurately explained the manner in which the jury should consider both in-court and out-of-court identifications. Moreover, at trial, Lieutenant Hoydis also identified defendant as the participant in the drug transaction with Phillips and, as such, Phillips's out-of-court identification of the photo, and in-court testimony that he was "on heavy drugs" when he looked at the photo and could not tell in court if defendant was the person from whom he had bought the drugs, rendered Phillips's identifications of so little credibility that their admission was not clearly capable of producing an unjust result.

We agree with defendant that the State's evidence was legally insufficient to demonstrate he had conspired with Phillips, and his conviction on count two, third-degree conspiracy to distribute CDS, must be reversed.

27

See State v. Roldan, 314 N.J. Super. 173, 182 (App. Div. 1998) (explaining Wharton's rule).

We disagree, however, that the State's evidence was insufficient to support defendant's conviction on count one, second-degree conspiracy to possess CDS with intent to distribute. Defendant never made a motion to dismiss the conspiracy charges or a motion for acquittal related to the conspiracy charges at trial. Because the issue is being raised for the first time on appeal, it is reviewed under the plain-error standard. R. 2:6-2; State v. Clark, 251 N.J. 266, 286-87 (2022); State v. Young, 448 N.J. Super. 206, 222 (App. Div. 2017) (applying plain-error standard when defendant did not raise challenge to one of the charges of which he was convicted). An appellate court will reverse under that standard only if any error is clearly capable of producing an unjust result. Dunbrack, 245 N.J. at 544.

Conspiracy requires "(1) a criminal purpose, (2) an agreement, and (3) an overt act by one or more of the conspirators." State v. Bennett, 194 N.J. Super. 231, 234 (App. Div. 1984); N.J.S.A. 2C:5-2(a). "[T]he quantum of evidence required as to each element is not great." Bennett, 194 N.J. at 234 (quoting State v. Hill, 166 N.J. Super. 224, 229 (App. Div. 1978)). An "agreement to commit a specific crime is at the heart of a conspiracy charge."

28

State v. Samuels, 189 N.J. 236, 245 (2007).  Yet, a conspiracy can be proven

through circumstantial evidence, as "[a]n implicit or tacit agreement may be

inferred from the facts and circumstances."  State v. Kamienski, 245 N.J.

Super. 75, 94 (App. Div. 1992).

There is a "general rule that a simple agreement to buy drugs is

insufficient to establish a conspiracy between the seller and the buyer."

Roldan, 314 N.J. Super. at 182.

> The essential rationale of the general rule, commonly
> referred to as Wharton's rule, is that where an
> agreement between two parties is inevitably incident
> to the commission of a crime, such as a sale of
> contraband, "conspiracy, which assumes the voluntary
> accession of a person to a crime of such a character
> that is aggravated by a plurality of agents, cannot be
> maintained."  However, when the evidence shows that
> two or more parties have entered into an agreement to
> engage in concerted criminal activity which goes
> beyond the kind of simple agreement inevitably
> incident to the sale of contraband and consequently
> "makes possible the attainment of ends more complex
> than those which one or more criminal could
> accomplish," . . . the participants may be found guilty
> of conspiracy.
>
> [Ibid. (citations omitted) (quoting Iannelli v. United
> States, 420 U.S. 770, 773, 778 (1975)).]

Federal courts have "identified various factors which may support the

conclusion that a defendant was a participant in a drug distribution conspiracy

29

rather than simply a seller or buyer in an isolated transaction."  Id. at 183.  One such factor is "evidence of transactions done on a consignment or credit basis" which shows "a level of cooperation and trust not typically found absent some type of agreement."  Ibid. (quoting United States v. Edwards, 36 F.3d 639, 643 (7th Cir. 1994)).  Another factor indicative of a conspiracy "is 'a pattern of frequent and repeated transactions' between the participants."  Ibid. (quoting Edwards, 36 F.3d at 643).

Defendant was charged under count one of the indictment with conspiracy by agreeing "with another person or persons" to "facilitate the crime of possession with intent to distribute a controlled dangerous substance" including "heroin or cocaine" between the dates of September 6, 2016, to September 28, 2016.  In relation to count one, the State established defendant had conspired with other individuals to facilitate possession of cocaine or heroin with the intent to distribute by the introduction of several phone calls and text messages from defendant's intercepted line.  Those calls and text messages included language of defendant interacting with other individuals to provide them with drugs, as detailed by the State's expert, Holt, who testified as to the different slang terms and "coded language" used in drug distribution.

30

The State thus presented circumstantial evidence that defendant was engaging in a conspiracy with a variety of individuals to possess cocaine and heroin with the intent to distribute them to these individuals.  See State v. Ruiz, 127 N.J. Super. 350, 357 (App. Div. 1974) (possession of CDS "is complete and the guilt of it established when it is proven that a person knowingly and intentionally possessed a controlled dangerous substance be it for his own use or distribution to others"); see also State v. Sainz, 210 N.J. Super. 17, 25 (App. Div. 1986) ("The elements of the crime [possession of CDS with intent to distribute] are present whether the intent is merely to share [CDS] casually with a friend or to control a widespread network of illicit distribution and sale."), aff'd, 107 N.J. 283 (1987).  The calls and text messages to the phone line the State maintained belonged to defendant portrayed "a pattern of frequent and repeated transactions" that could lead a jury to believe defendant's conduct went beyond isolated drug sales to engaging in a drug distribution network to support a conspiracy charge. Roldan, 314 N.J. Super. at 183 (quoting Edwards, 36 F.3d at 643).

Some of the calls and text messages appeared as if these individuals had engaged with defendant before.  For instance, one of text messages introduced asked, "he[y] did you re up?" indicating that defendant had not only potentially

31

sold to this individual previously, but also that defendant was likely buying his supply from someone else higher in the chain, and then selling what he received to his customers. Another text message asked "[c]an you let me get twenty or a band and I'll pay you the rest later? You know I pay you if you will hit me?" That text indicates "a level of cooperation and trust" that could also lead a jury to believe defendant was not engaging in isolated drug sales, but part of a larger distribution network sufficient to support a conspiracy charge. Roldan, 314 N.J. Super. at 183 (quoting Edwards, 36 F.3d at 643).

We reject defendant's claim that cumulative errors, which we have not found, deprived him of a fair trial, State v. T.J.M., 220 N.J. 220, 238 (2015), and turn to his arguments about his sentence. Defendant argues his sentence violates the Attorney General's Directive eliminating mandatory minimums for non-violent drug offenses and also our sentencing code because the trial court improperly weighed the aggravating and mitigating factors, requiring a remand for resentencing. The State argues defendant does not have standing as a third party to invoke the Attorney General's Directive and that the trial court properly weighed the aggravating and mitigating factors regarding defendant's sentence.

32

Defendant was convicted of second-degree conspiracy to possess CDS with the intent to distribute (count one), third-degree conspiracy to possess CDS (count two), third-degree distribution of CDS (count three), two counts of third-degree possession of CDS (counts four and seven), and second-degree possession of CDS with the intent to distribute (count five). At his sentencing hearing, defendant argued the court should apply the following mitigating factors five, the victim of defendant's conduct induced or facilitated its commission; nine, defendant's character and attitude indicate he is unlikely to commit another offense; and eleven, defendant's imprisonment would entail excessive hardship to him or his dependents. N.J.S.A. 2C: 44-1(b)(5), (9) and (11).

Under mitigating factor five, N.J.S.A. 2C:44-1(b)(5), defendant argued that Phillips induced or facilitated his purchase of narcotics. Regarding mitigating factor nine, N.J.S.A. 2C:44-1(b)(9), defendant highlighted how "the probation officer who completed the presentence memo" "basically said that this event was probably or likely words to the effect of a coming home to Jesus moment and [defendant] hasn't been in trouble since he was arrested" on these charges nearly seven years prior to his sentencing. He also argued that while "he has a minimal criminal record . . . it's not considered a significant threat to

the community."  As to mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11), defendant argued his imprisonment would be "a[n] excessive hardship for the family members."

Defendant argued the State's application for a mandatory extended term, was "arbitrary and capricious and actually somewhat vindictive because of what happened during the course of the trial with the gun issues.  Because the prior negotiations all involved the gun matter.  And [defendant] was acquitted on that charge."  Defendant "ask[ed] the [c]ourt not to consider the extended term and sentence within the ordinary range."

The State countered that "this is a mandatory extended term" and "[i]t's not discretionary."  The prosecutor argued defendant's two prior convictions "have two separate sentencing dates, conviction dates" and "[s]o for the purposes of [N.J.S.A. 2C:]43-6(f), those count as two prior distribution style offenses."

As already noted, the judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3); five, N.J.S.A. 2C:44-1(a)(5); six, N.J.S.A. 2C:44-1(a)(6); and nine, N.J.S.A. 2C:44-1(a)(9); and no mitigating factors.  The judge considered mitigating factor seven, N.J.S.A. 2C: 44-1(b)(7), that defendant . . . has led a law-abiding life for a substantial period of time, based on the pre-sentence

report but rejected it given defendant's "substantial criminal record." The judge also rejected defendant's argument as to mitigating factor five, finding the individuals defendant sold drugs to "were not his victims, they were co-defendants . . . co-conspirators."

Although our review of a sentence is guided by an abuse of discretion standard, State v. Torres, 246 N.J. 246, 272 (2021), nevertheless trial courts must "explain and make a thorough record of their findings to ensure fairness and facilitate review." State v. Comer, 249 N.J. 359, 404 (2022). "[C]ritical to the sentencing process and appellate review is the need for the sentencing court to explain clearly why an aggravating or mitigating factor presented by the parties was found or rejected and how the factors were balanced to arrive at the sentence." State v. Case, 220 N.J. 49, 66 (2014). "The finding of any factor must be supported by competent, credible evidence in the record." Id. at 64.

The State moved for the imposition of a mandatory extended term pursuant to N.J.S.A. 2C:43-6(f), which provides in pertinent part:

> A person convicted of manufacturing, distributing, dispensing or possessing with intent to distribute any dangerous substance or controlled substance analog under N.J.S.A. 2C:35-5 . . . who has previously been convicted of manufacturing, distributing, dispensing or possessing with intent to distribute a controlled

35

dangerous substance or controlled substance analog, shall upon application of the prosecuting attorney be sentenced by the court to an extended term . . . notwithstanding that extended terms are ordinarily discretionary with the court. The term of imprisonment shall, except as may be provided in N.J.S.[A.] 2C:35-12, include the imposition of a minimum term. The minimum term shall be fixed at, or between, one-third and one-half of the sentence imposed by the court . . . during which the defendant shall be ineligible for parole.

[N.J.S.A. 2C:43-6(f).]

See also State v. Vasquez, 129 N.J. 189, 195 (1992) (noting N.J.S.A. 2C:43-6(f) "requires a court to impose an extended term with a period of parole ineligibility for a repeat drug offender"). Our Supreme Court has held, however, that "an extended term may be denied or vacated where defendant has established that the prosecutor's decision to seek the enhanced sentence was an arbitrary and capricious exercise of prosecutorial discretion." State v. Lagares, 127 N.J. 20, 33 (1992).

Attorney General Law Enforcement Directive No. 2021-4 "establishes statewide rules that require prosecutors to seek the waiver of mandatory parole disqualifiers for non-violent drug crimes during plea negotiations, following a probation violation, and after conviction at trial." See State v. Arroyo-Nunez, 470 N.J. Super. 351, 360 (App. Div. 2022) (noting Directive 2021-4 was

implemented to end the imposition of mandatory parole ineligibility for non-violent drug crimes).  One such "non-violent drug crime[]" listed in Directive 2021-4 is N.J.S.A. 2C:35-5, possession of a controlled dangerous substance with intent to distribute.

The Directive also states, "[n]othing in this Directive prohibits a prosecuting attorney from seeking a mandatory extended term pursuant to N.J.S.A. 2C:43-6(f), provided that the prosecuting attorney agrees to waive the extended period of mandatory parole ineligibility."  When a defendant is convicted at trial of "a qualifying Chapter 35 offense," including an offense subject to a mandatory extended term pursuant to N.J.S.A. 2C:43-6(f), the prosecutor "shall offer the defendant an opportunity to enter into an agreement prior to sentencing" that contains a period of parole ineligibility equal to "one-third of the sentence . . . as if the individual had not been subject to a mandatory minimum term."  See Arroyo-Nunez, 470 N.J. Super. at 362 (noting Directive 2021-4 contains a "requirement to waive mandatory periods of parole ineligibility for all current and future defendants").

The Directive also contains a "[n]on-enforceability" provision:

> This Directive is issued pursuant to the Attorney General's authority to ensure the uniform and efficient enforcement of the laws and administration of criminal justice throughout the State.  This Directive

37

> imposes limitations on law enforcement agencies and officials that may be more restrictive than the limitations imposed under the United States and New Jersey Constitutions, and federal and state statutes and regulations. Nothing in this Directive shall be construed in any way to create any substantive right that may be enforced by any third party.

Because the court had merged certain convictions, defendant was sentenced for his convictions under counts five and three. He was convicted under count five for second-degree possession of CDS with intent to distribute in violation of N.J.S.A. 2C:35-5(b)(2), a qualifying offense under N.J.S.A. 2C:43-6(f). The judge found at the sentencing hearing that defendant had a previous conviction in violation of N.J.S.A. 2C:35-5(b)(3). Thus, with an application from the prosecutor, as happened here, defendant was subject to a mandatory extended term under N.J.S.A. 2C:43-6(f).

He does not argue he was ineligible for a mandatory extended term under N.J.S.A. 2C:43-6(f), but that his sentence violates Directive 2021-4. Although Directive 2021-4 does not prohibit a prosecutor from seeking a mandatory extended term, it requires prosecutors to waive mandatory parole disqualifiers for non-violent drug offenses, including those under N.J.S.A. 2C:35-5. Arroyo-Nunez, 470 N.J. Super. at 360, 362. That was not done by the prosecutor here, and defendant was sentenced under count five to a period

of seven-and-a-half years of parole ineligibility, equal to fifty percent of his sentence under that count. Because defendant's sentence under count five violates Directive 2021-4 by not containing a period of parole ineligibility equal to "one-third of the sentence . . . as if the individual had not been subject to a mandatory minimum term," Arroyo-Nunez, 470 N.J. Super. at 362, we vacate his sentence and remand for resentencing pursuant to Directive 2021-4.

We also agree with defendant that resentencing is required because the court failed to adequately explain its reasons for the basis of and weight ascribed to several aggravating factors and failed to address all of the mitigating factors argued by defendant. See Case, 220 N.J. at 66.

We reverse defendant's conviction for third-degree conspiracy to distribute CDS, affirm his remaining convictions, vacate his sentence, and remand for a resentencing hearing. See State v. Randolph, 210 N.J. 330, 354 (2012).

Reversed in part; affirmed in part; and remanded for a resentencing hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1275-22